**SAN ANTONIO HERMANN SONS HOME ASS'N v. HARVEY.**

No. 10099.

Court of Civil Appeals of Texas. Austin.

March 25, 1953.

Rehearing Denied April 15, 1953.

Schweppe & Schweppe, San Antonio, Moursund, Ball, Moursund & Bergstrom, by T. B. Moursund, all of San Antonio, for appellant.

Al J. Klein, Elmer Ware Stahl and A. R. Sohn, all of San Antonio, for appellee.

GRAY, Justice.

Lucille Harvey, a feme sole, recovered a judgment against San Antonio Hermann Sons Home Association, a fraternal corporation, for damages for personal injuries. She alleged her injuries were sustained when she overbalanced and fell down a ramp in defendant's building in San Antonio.

In 1949, the defendant completed an addition to its building on South St. Mary's Street in the City of San Antonio. On the street level of this addition there was a parking lot area and on the floor above that level the defendant had bowling alleys, a cafe and a bar, or at any rate served drinks there. In the basement of the

original building there was a social room, a rathskeller, pool and card tables. The ramp in question was one of the ways commonly used by persons going to or from the bowling alley area. The ramp was indoors and led up from the first floor level to the floor where the bowling alleys, the cafe and the bar were located. Its length was 37 feet, 7.2 inches and it rose to a height of approximately 9 feet and 8 inches—the incline or slope was 26.79 per cent. The ceiling over the ramp sloped evenly and parallel with the ramp and there was a row of lights in the ceiling for lighting purposes. The ramp ran generally from the south to the north (rising to the north), it was divided into two aisles by a center handrail, and there was also a handrail on each side wall. In ascending the ramp the east aisle was generally used and in descending the west aisle was used. At the top of the ramp, or the second floor level, there were two doors which were hinged to the wall sides, they opened from the middle, away from the ramp and into the second floor level—the bowling alley area. Each of these doors was 3 feet wide, 6 feet, 10 inches high and each had a glass panel or window 22½ inches square, the bottom of which was 52¾ inches above the floor level. When closed these doors were within a few inches of the above mentioned handrails, and there was a level space of 6.05 inches between the bottom of the doors and the beginning of the slope of the ramp. These doors opened to or from the corresponding aisles of the ramp. At the bottom and south end of the ramp there was a small level landing and beyond it a solid wall. There were no printed signs on or by the doors to warn persons about to use the ramp of the conditions beyond the doors.

At the time of the accident plaintiff was wearing shoes with heels that gave her a total height of approximately five feet.

The bar, where soft drinks and beer were sold, and the cafe, where food was sold, were operated together. They opened at 8 o'clock a. m. and remained open until 12 o'clock p. m. on week days and Sundays but remained open on Saturdays until 1 o'clock a. m. Sunday mornings. The public was served food and drinks there.

On Sunday, about March 4, 1951, at 8:00 or 8:30 p. m., plaintiff and her escort, Frank Rapp, and his friend, Al Page, visited defendant's premises. They had parked their car a distance away and had walked to the building. In going up they used the ramp and went into the bowling alley area. They sat down at a table, but shortly afterwards plaintiff left and visited for a while with a lady acquaintance at a nearby table. While plaintiff was away Mr. Rapp and Mr. Page were served beer and were joined by R. C. Miller. Upon plaintiff's return to the table she had a coke. Plaintiff then suggested that they go home but it was decided that they would first go "downstairs." This was plaintiff's first visit to the premises, and apparently Al Page wanted plaintiff and her escort to see the downstairs. The parties remained in the bowling alley area a comparatively short while and then left their table for the purpose of going downstairs. Plaintiff and her escort, Mr. Rapp, proceeded to walk toward the doors and were followed by Mr. Page and Mr. Miller. As they reached the door plaintiff was on Mr. Rapp's left, they were walking normally and plaintiff said that as Mr. Rapp opened the door she was on his left and close enough to the door that it brushed her dress as it was opened. She further said:

"I was watching him when he opened the door; and when he opened the door I was watching his hand on the knob of the door, and as he opened the I passed through."

She described her fall as follows:

"Well, as he opened the door, I followed in and, when I put my foot in the first normal step, I lost my balance. I couldn't gain my balance going down and I was going down so fast; and I was reaching to find something to hold to and I screamed just before I got to the bottom of the landing, I guess, wherever I hit, I don't remember."

Plaintiff's head struck the wall at the foot of the ramp, she was rendered uncon-

scious and sustained the injuries here complained of.

The parties had used the ramp on their trip up to the bowling alley area and plaintiff said it was steep, that she held to the handrail, that her escort slipped going up and cautioned her that it was slippery. The trip up was apparently made by using the east aisle and plaintiff's fall was on or down the west aisle. She said that as she and her escort approached the doors to go downstairs, she did not look through the glass windows in the doors; that she did not know she was going to use the same ramp going down that she had used coming up, that she expected a level landing as she stepped through the door, and that she expected a stairway.

No warning was given plaintiff as to the way to be used in going down nor was there any suggestion that the parties were going downstairs to visit places passed by plaintiff on her way up from the street.

Architects, engineers and lay witnesses testified relative to the ramp, the doors leading to it and other matters relative to construction. Some said they were in keeping with proper and standard practices and were safe, some said they were not. There was evidence that the maximum grade recommended for pedestrian ramps was 16⅔ per cent. And also that in door-ramp combinations it is considered good practice to have a level landing on the ramp side which landing is at least equal to the width of the doors, because such landing eliminates the element of surprise to a person stepping through the door.

There was evidence that prior to the accident one person fell on the ramp and that this fact was known to one of defendant's directors. Also the evidence showed that the ramp was used daily and that many people had used it.

In addition to the negligence alleged in her original petition, by trial amendment, plaintiff alleged that defendant's failure to have a platform or level landing in excess of 6.05 inches at the head of the ramp created a dangerous and unsafe condition; that such failure was negligence and a proximate cause of the accident.

The trial was to a jury. At the conclusion of the evidence defendant made a motion for an instructed verdict which was overruled. The jury found that defendant was negligent; (1) in maintaining the ramp in question with a 26.79 per cent grade; (3) in failing to provide a level platform in excess of 6.05 inches on the ramp side of the doors; (6) in maintaining doors that concealed the ramp; (8) in failing to have any warning or cautionary sign as to the size of the level platform at the head of the ramp; (10) in failing to provide a level platform in excess of 6.05 inches on the ramp side of the door at the head of the ramp in connection with the type of door in question; (12) in failing to have any warning or cautionary sign on the door in question as to the existence of a ramp on the other side of the door. By issues 2, 4, 9, 11 and 13 the jury found that the negligence of defendant found in answer to the respective preceding issues (1, 3, 8, 10 and 12) was a proximate cause of the accident. By issue (5) the jury found that on the occasion in question the doors concealed the ramp, and issue (7) that the negligence found in answer to issue (6) supra, was a proximate cause of the accident. The jury found that: (14) plaintiff did not fail to keep such a lookout for her own safety as a person of ordinary prudence would have kept under the same or similar circumstances; (16) that she did not fail to use a handrail upon attempting to descend the ramp. Preceding issue (15) and issue (17) the jury was instructed to answer those issues only if they had answered issues (14) and (16) respectively "Yes." Those issues were answered "No," and the jury proceeded to answer issues (15) and (17) "No." Issue (15) asked if the failure inquired about in issue (14), was a proximate cause of the accident; issue (17) asked if the failure, if any, inquired about in issue (16) was negligence. Preceding issue (18) the jury was told to answer it only if issue (17) was answered "Yes." That issue was answered "No" and the jury proceeded to answer issue (18) "No." It asked if the negligence, if any, inquired about in issue (17) was a proximate cause of the accident. Issue

(19) asked if the failure of plaintiff to grasp a handrail shortly after she started down the ramp was negligence. This issue was answered "No." The jury was instructed to answer issue (20) only if they had answered (19) "Yes." Issue (20) inquired if such negligence, if any, was a proximate cause of the accident. The jury answered "No." Issue (21) asked if plaintiff's running down the ramp or a portion thereof was negligence and it was answered "No." The jury was instructed to answer (22) only if they had answered (21) "Yes." Issue (22) asked if such negligence, if any, was a proximate cause of the accident, and the jury answered "No." In answer to issue (23) the jury found the accident was not unavoidable, and by issue (24) found that $30,000 if paid now in cash would reasonably compensate plaintiff for the injuries sustained by her.

Defendant made a motion for a judgment non obstante veredicto. The motion was overruled and a judgment was rendered for plaintiff for $30,000 and interest.

Defendant brings forward eighty-eight points. These are too numerous to state singly or by grouping but we will consider and decide each.

■■■ It may be said that plaintiff voluntarily left her place at the table and approached the door leading to the ramp for the express purpose of going through the door and downstairs. But to say that she did so with full knowledge of the existence of the ramp in question, its grade and "of every condition embraced in the issues submitted to the jury in her behalf" would ignore her testimony that: she did not know she was going down the same ramp she had used coming up; she did not know there was a ramp there; she expected a level landing beyond the door, and she expected to go down a stairway. It would also ignore all other relevant facts and circumstances in evidence. To so say would deprive the jury of its exclusive right to pass on the credibility of the witness, the weight to be given to the testimony, and to find the facts from the evidence.

The conduct of the plaintiff must be measured by the degree of care that she exercised, or failed to exercise, for her own safety. The jury was given definitions of ordinary care, negligence and proximate cause. With these definitions as guides the jury exonerated plaintiff and convicted defendant of negligence proximately causing the accident.

Defendant asserts that the handrails along the ramp were available to plaintiff and that she was negligent in failing to use them. The handrails were a few inches beyond the door, on the ramp side. They were not available to a person leaving the bowling alley area to go down the ramp until the door was opened and the party placed in such position as to be able to reach them. This, we think, was logically by a forward movement toward the handrails. Plaintiff did not say that she either saw or expected to use the handrails but she did say that when she took her first normal step forward she overbalanced and did not regain her equilibrium. Frank Rapp said that after plaintiff overbalanced she bounced from side to side of the ramp. That she reached for the handrails on her way down but was unable to hold them.

■■ Relative to the absence of a level landing we attach no particular importance to the fact that plaintiff did not look through the glass window in the door prior to stepping through. The bottom of the window was 52¾ inches above the floor on which plaintiff was standing and her height was 61½ inches. Thus we think it would have required plaintiff to have exerted more than ordinary care to have looked through the window and observed the absence of a level landing on the opposite side of the door and certainly of the condition there—a level landing of 6.05 inches beyond the door. We repeat it was at this landing that appellant overbalanced.

Defendant asserts that the glass in the door was clear and says that plaintiff should have looked through the glass window and by the aid of the lights above the ramp observed that it was there and its condition including the presence of the handrails. There is some evidence that the glass was not clear, that it was cloudy and was covered by chicken wire. To agree

with appellant would require us, rather than the jury, to weigh the evidence. We think an ordinary person expecting to go down a stairway and observing overhead lights might reasonably conclude the stairway was lighted. These conditions presented issues of fact for the jury to determine and the jury found that plaintiff did not fail to keep a proper lookout for her own safety. (Issue (14), supra). From the testimony before us it cannot be said that the danger was obvious and reasonably apparent to plaintiff, or that it was as well known to her as it was to defendant. Hall v. Medical Bldg. of Houston, Tex.Sup., 251 S.W.2d 497. The test to be applied to these facts is: Did plaintiff act as a reasonably prudent person would, or should, have acted under the same or similar circumstances? Walgreen-Texas Co. v. Shivers, 137 Tex. 493, 154 S.W.2d 625.

The evidence must be construed most favorably to plaintiff (the jury's verdict) and from it "we cannot say * * * that the conduct of plaintiff was so opposed to common prudence that no careful person would have conducted himself in the same or a similar manner." Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W. 2d 609, 622. Under all of the evidence it was an issue of fact and not a question of law as to whether or not plaintiff was guilty of contributory negligence. Renfro Drug Co. v. Lewis, supra; Loughry v. Hodges, Tex.Civ.App., 215 S.W.2d 669, error ref., n. r. e.

Except on special occasions or for special events the premises were open to the public. Food and drinks were served to the public there from the time the premises opened in the morning until they were closed. For this reason the premises were public and plaintiff was an invitee. Walgreen-Texas Co. v. Shivers; Renfro Drug Co. v. Lewis, both supra. This fact being established (except as to dangerous conditions "that are obvious, reasonably apparent, or as well known to the person injured as they are to the owner or occupant") it is the law that:

"* * * the owner or occupant of the premises owes to an invitee or business visitor the duty to use reasonable care to keep the premises in a reasonably safe condition so that he will not be injured."

Hall v. Medical Bldg. of Houston, supra [251 S.W.2d 500], and authorities there cited, Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853. And regardless of whether or not plaintiff went to the premises for the purpose of making a purchase, the defendant's duty extended to the entrances to and exits from the premises. Renfro Drug Co. v. Lewis, supra.

Defendant says it is not liable for plaintiff's injuries because the building (including the ramp, the doors and the approaches to the ramp) was designed and constructed by an experienced and reputable engineer contractor who associated with him an experienced and reputable architect, the plans and specifications were submitted to the proper city officials, a building permit was obtained, and the building was constructed without change in such plans and specifications.

Defendant cites Hamblen v. Mohr, Tex. Civ.App., 171 S.W.2d 168, 171, error ref., w. o. m. In that case the injuries complained of were sustained by an invitee on a winding stairway in a leased building. The suit was against the tenant and the owner of the building. House was the owner. J. C. Penney was the lessee and tenant and operated a department store in the building. The petition alleged: "that the lights of the store cast shadows upon the steps, and the condition thus produced was inherently dangerous and constituted a concealed danger at the time the building was leased," and alleged that the owner and the tenant were jointly liable for the injuries. The tenant answered that it had settled the claim as against it, and by cross-action sought a recovery against the owner for the amount so paid. The owner defended on the grounds here relied on by defendant and on appeal, among other points, urged that "The alleged defect was not such concealed defect as to render House liable to invitees of Penney." In its opinion the Court observed that "no contention is made that, if said plans and

specifications be taken as the standard for such construction, the stairs as constructed were defective." (Here this is a disputed issue.) The Court quoted from 45 C.J. 865, as follows:

> "One who has taken all proper care to render a building safe is not liable for unknown and hidden defects in it, as for example, where he has committed its plan and construction to a competent architect and builder." See, also, 65 C.J.S., Negligence, § 81.

and in its opinion said:

> "* * * However, the condition of the stairs here complained of was certainly not one which was concealed. so far as the construction of the building was concerned. The 'condition' was one prescribed by the architect and constructed by the builder, and it was as open to observation, the matter of lighting aside, as any other steps. In other words the condition of the steps, whether safe or dangerous, was, so far as the matter of construction was concerned, open to observation. The steps were constructed solidly and soundly, according to a plan devised by an architect whose competency is not challenged, which plan was duly approved by the proper City official as complying with City requirements. This was not the planning and setting of a dangerous trap. Traps are not thus planned and set. If there was proper and sufficient light so that one could clearly see the condition of the steps, the condition was a lighted and exposed condition. The proof showed that the store did not depend upon daylight for its lighting, but depended entirely upon artificial lighting, running its lights full blast at all times it was open. The jury found that the steps were inadequately lighted, and that this inadequate lighting was a proximate cause of Mrs. Mohr's injuries. In other words, though the jury found in effect that the steps were dangerous, we see that they were not constructed so as to conceal the danger, but were constructed so their condition was open to observation. The only support in the

evidence for the finding that the danger was concealed lies in the inadequate lighting. For inadequate lighting of the store, the operator of the store is responsible. Landlords do not ordinarily furnish lights in buildings leased for stores, and did not here."

In reaching its conclusion that the owner was not liable, the Court said:

> "* * * To hold the owner of a building liable under these facts is to abolish the rule that he is obligated only to exercise ordinary care to select a competent architect and builder, as declared in White v. Green, supra, and makes him liable for their negligence."

The Court cited White v. Green, Tex. Civ.App., 82 S.W. 329, which cites O'Connor v. Andrews, 81 Tex. 28, 16 S.W. 628, 630. In the later case the Court sustained a recovery of damages for personal injuries sustained when a cornice and firewall, to which an electric wire was attached, fell. The wire had been placed there without the knowledge or consent of the owner. It was accidently pulled and caused the cornice and firewall to fall. The whole of the building was leased to separate tenants, but the cornice and firewall were in the possession and under the control of the owner. There was no question of approved plans and construction by an architect or contractor involved. In upholding a verdict for the plaintiff the Court approved the trial court's charge that if the owner "knew, or by the use of reasonable care and prudence, could have known, that it [the wire] was so attached to said cornice and firewall, and that it would naturally produce accident and injury to those passing along the street, then the allowing it to remain so attached would be negligence on defendant's part." The Court said:

> "* * * If the defendant was responsible for the condition of the wall, and knew that it had been rendered dangerous by attaching the wire to it, and knowingly, or without the use of proper diligence, permitted the dangerous condition to remain he was correctly held to be responsible for the consequences."

In White v. Green, supra, property was damaged when a brick wall, part of a building, fell. The building was constructed according to plans and specifications drawn by an architect, these were defective and the defects caused the wall to fall. A judgment for the plaintiff was reversed because of the exclusion of evidence and the refusal of a special charge relative to the employment of a skilled and competent architect to prepare plans and specifications. The Court said [82 S.W. 330]:

> "The erection of an ordinary building is not intrinsically dangerous, and when the owner contracts with an architect and builder for its erection he is only bound to use ordinary care in their selection. So, if in this case such care was used by White in employing an independent architect and contractor, he was not responsible for their negligence, unless it was such as he, by ordinary care, could have anticipated or known thereof."

In Renfro Drug Co. v. Lewis, supra, the Court said that it did not agree that the bank should be relieved of liability under the rule announced in Hamblen v. Mohr, supra, and observed that the evidence did not show that the doorway there in question was designed by any architect. This was a sufficient reason for the Court not to discuss the rule.

■ ■ Defendant was the owner and was in possession of the premises, and owed a duty to invitees "to inspect the premises to discover dangerous conditions * * *; to provide coverings or guardrails or similar devices to protect persons lawfully on the premises from harm * *; or to warn such persons of the existence of dangers which could not reasonably be expected to be apparent or obvious". Smith v. Henger, supra [148 Tex. 456, 226 S.W.2d 431]. The defendant was bound to keep itself informed as to the condition of the premises and was liable to plaintiff for injuries resulting from defects or dangerous conditions if by the exercise of reasonable care it could or should have discovered such dangerous conditions or defects. Authorities, supra; 65 C.J.S., Negligence, § 81, p. 580.

Injuries sustained from dangers that were open, obvious and reasonably apparent or as well known to the injured person as to the owner, of course, are not within the above rule.

■ The question of whether or not defendant discharged the duty resting on it was one of fact.

Defendant says that prior to the accident the rubber mat covering the ramp was removed and replaced by a coating of Ferrox, a "non slip abrasive." It was on this covering that plaintiff's escort slipped and which he warned plaintiff was slippery. At least one person had fallen on the ramp prior to plaintiff which fact was known to defendant, but whether this was before or after the change of the covering is not altogether clear. Defendant's engineer contractor who constructed the ramp and door combination said he designed and built steps for an exit from the building towards St. Mary's Street, that he specified solid doors and an 18-inch level landing on the "step side" of these doors, and that this was done in order to give a person "sufficient distance from the first step for him to realize that there are stairs down." These solid doors were later removed by defendant and were replaced by doors with glass going to the bottom. Painted on these doors was "Warning, Step Down." This was done as a safety measure to warn people there were steps on the other side of the doors.

■ No issue was submitted, none was requested, inquiring whether or not defendant by the use of ordinary care could or should have discovered the dangers or defects, if any, complained of, and there was no objection to the failure to submit such issue. Therefore, if a finding on that issue was necessary, it must be presumed that the trial court made such findings as will support his judgment. Rule 279, Texas Rules of Civil Procedure, Cochran v. Wool Growers Central Storage Co., 140 Tex. 184, 166 S.W.2d 904, 3–B Tex.Jur. p. 401, § 919.

■ The trial court instructed the jury to answer issues 15, 17, 18, 20 and 22, supra, only if the respective preceding issues were answered "Yes." Such preceding is-

sues were answered "No." Although the issues were answered contrary to the instruction to the jury, we fail to see how defendant was prejudiced or that any substantial right has been violated. An examination of the issues and answers does not indicate that the trial court's judgment was based thereon. However the judgment must be sustained by other answers of the jury and the error, if any, is harmless. Loughry v. Hodges, supra, 3–B Tex.Jur. § 1037.

██ Various objections were leveled at issues (1) and (3), supra. There was no dispute as to the grade of the ramp nor as to width of the level landing on the ramp side of the door. The ramp had been in use since the building was completed by persons going to and from the bowling alley area. This use was through the door and over the 6.05 inch level landing. These conditions, except such repairs as were made to the ramp by recovering it above mentioned, had existed and had been in the control of defendant since the beginning of the use thereof. The suggestion to the jury, if any, that the ramp and the size of the level platform at the head of the ramp, were unsafe, dangerous and improper, and that a ramp with some other grade, and some other size of level platform should have been maintained is to be found in the evidence from which evidence it was for the jury to say whether or not such maintenance was negligence.

██ Plaintiff's trial amendment was a sufficient pleading to support the submission of issue (3). Rule 66, Texas Rules of Civil Procedure.

██ Plaintiff's pleading contains a substantial description of the door at the head of the ramp; alleged the absence of any sign warning of the ramp, its grade or the absence of a level landing on the ramp side of the door; alleged that the door and ramp constituted a concealed danger and was a violation of defendant's duty to keep the premises in a reasonably safe condition; alleged that as one is about to leave through the door he cannot see what is on the other side, and alleged defendant to be negligent in these several respects. The word "con-ceal" as used in issue (5) when considered in connection with the pleadings, the evidence and applied to plaintiff at the time in question clearly means to cover, keep from sight or prevent the discovery of. When so considered it was easily understood by the jury, and did not imply a wilful, positive or affirmative act and was not inflammatory and prejudicial to defendant.

It was a fact issue whether or not plaintiff in keeping a lookout for her own safety (issue (14)) should have looked through the glass window in the door and thereby gained knowledge of the conditions beyond.

██ Plaintiff overbalanced when she took the first step through the door after it was opened by her escort. There was no sign on the door warning of the conditions beyond the door. The duty rested on defendant to keep the premises safe for invitees and to inspect them to discover dangerous conditions. Smith v. Henger, supra. Under the definition of negligence given the jury, it was for the jury to say whether or not the absence of a warning sign was negligence.

██ Issue (3) asked if the failure to provide a level platform in excess of 6.05 inches at the head of the ramp on the ramp side of the door was negligence?

Issue (10) asked if this failure "in connection with the type of door in question" was negligence?

Even if it be conceded that these issues was a double submission of the same matter "we are unable to say that the error complained of, if any, was calculated to cause and probably did cause the jury to render a verdict different from that which it would have rendered but for the error." Dallas Railway & Terminal Co. v. Bailey, Tex.Sup., 250 S.W.2d 379, 384. Tripp v. Watson, Tex.Civ.App., 235 S.W.2d 677, error ref., n. r. e.

For the same reasons the objections that issues (8) and (12) constitute a double submission of the same inquiry are overruled.

██ The evidence is conflicting as to whether or not the door-ramp combination without a level landing in excess of 6.05 inches on the ramp side was proper.

We do not think issues (3) and (10) informed the jury that there was something wrong with such combination. Neither do we think that issues (8) and (12) informed the jury that any duty rested on defendant to have a warning sign on the door.

Plaintiff would have been 35 years of age on March 30, 1951, after the accident. She reached the eleventh grade in school and moved to San Antonio in 1942, where, except for about three months, she had been continuously employed as a waitress in a cafe and earned from $20 to $22.50 per week. She is not shown to have had any other means of livelihood. She sustained skull fractures in the accident, was unconscious for several days, and has since suffered from headaches and dizziness, her mental attitude is affected and she has not been able to work since the accident. Her doctor testified that she could not expect further improvement and that her mental attitude was permanent.

Both lay and medical witnesses testified as to plaintiff's condition and there are conflicts in the medical testimony as to the character and extent of the plaintiff's injuries. The jury's award, when measured by the guide given them, was to compensate plaintiff for her past and future physical pain, past and future mental suffering, the reasonable value of lost earnings and for the impairment of her capacity to work and earn money in the future.

We have found nothing in the record sufficient to show that the jury did not honestly, fairly and impartially weigh the evidence and reach a verdict uninfluenced by passion, prejudice or any improper motive. For this reason we cannot say the verdict is excessive. Missouri Pac. Ry. Co. v. Lehmberg, 75 Tex. 61, 12 S.W. 838; Gulf, C. & S. F. Ry. Co. v. Shamburger, Tex.Civ.App., 231 S.W.2d 784.

We hold that there was sufficient evidence to support the submission of the several special issues, and it therefore follows that the trial court properly overruled defendant's motion for an instructed verdict and its motion for judgment non obstante veredicto.

We have considered each of defendant's points and finding no reversible error the judgment of the trial court is affirmed.

Affirmed.